FILED
SUPERIOR COURT
OF GUAM

2019 MAY 31 PM 3 29

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| TIMOTHY J. ROHR,<br><br>Plaintiff,<br><br>vs.<br><br>LEONE R. WILLIAMS-ROHR<br><br>Defendant. | Case No. DM0505-17<br><br>**DECISION AND ORDER** |

## INTRODUCTION

Plaintiff has moved to be awarded physical custody of his two minor children during the upcoming summer, and Defendant has opposed the motion. This matter is before the Honorable Michael J. Bordallo. Plaintiff Timothy J. Rohr ("Plaintiff") is represented by Daniel S. Somerfleck, Esq. of Somerfleck & Associates, PLLC. Defendant Leone R. Williams-Rohr ("Defendant") is represented by Jeffrey A. Cook, Esq. of the Law Offices of Cunliffe & Cook . Having considered the arguments and the applicable law, the Court hereby **DENIES** Plaintiff's Motion for Summertime Visitation inasmuch as it refers to the children residing on Guam but **GRANTS** Plaintiff summertime visitation of his children in the U.S. Virgin Islands according to the terms described in this decision.

## BACKGROUND

This matter arises out of Plaintiff's Motion for Summertime Visitation, filed Apr. 2, 2019. Defendant filed an opposition on Apr. 30, 2019. Plaintiff filed a reply on May 14, 2019. The matter is now before the Court.

## FACTS

1. The parties were married on May 11, 1986 in St. Croix, U.S. Virgin Islands and have eleven children together.

2. Two children of the marriage are still minors, William, age 14, and Gianna, age 11 (the "Minors").

3. William has autism and developmental delays and requires behavioral programs and schooling unique to his special needs.

4. In June 2017, after 31 years of marriage, the parties separated.

5. Defendant relocated with the Minors to the U.S. Virgin Islands, the place where Defendant was born and raised and where she has a large support system of family and friends. The other nine children, now adults, live scattered throughout the United States and possibly Guam. Plaintiff now lives alone in Agat on Guam.

6. Each party has filed a complaint for divorce. Plaintiff filed in Guam on Sep. 20, 2017, and Defendant filed in the U.S. Virgin Islands on Nov. 14, 2017.

7. Plaintiff travelled to visit the Minors in the U.S. Virgin Islands for a week in August 2018 and again for two and half weeks around Christmas 2018.

8. Presently, the Court has not issued a final divorce decree, so custody must be ordered *pendente lite*.

9. On July 31, 2018, the Court granted *pendente lite* custody of the Minors to Defendant living in the U.S. Virgin Islands until a custody study was completed. At the time, the

Court stated, "[W]hile there is inconclusive evidence to establish that child abuse has occurred or is likely to occur with respect to the remaining minor children, the Court must take into consideration the declarations from the parties' other children and finds the allegations of past abuse credible." Decision and Order, Jul. 31, 2018.

10. In addition, in that decision the Court observed that after the litigation is over, the children may end up residing primarily in the U.S. Virgin Islands, and the Court didn't want to disrupt the Minors' lives any more than necessary. In particular, the Court wanted to avoid the plausible situation where the children move back to Guam *pendente lite* only to return to the U.S. Virgin Islands at the conclusion of the litigation.

11. Also in that decision, the Court ordered Defendant to provide Plaintiff liberal access to the Minors via telephone and video conferencing. The Court also ordered Defendant to update Plaintiff on all school and medical issues and allow Plaintiff full access on other decisions regarding the Minor's needs.

12. Seven of Plaintiff's nine now-adult children have filed declarations in which they described their childhood as a time of abuse, deception, and neglect by Plaintiff. Most recently, five adult children have submitted declarations vehemently opposing that the Minors spend the summer in the physical custody of Plaintiff.

13. These adult children reveal strong feelings of animosity toward Plaintiff and accuse him of emotional, physical, and sexual abuse during their growing up years. Some of these adult children and their mother, Defendant, assert that Plaintiff was physically and emotionally abusive toward Defendant during their marriage. The adult children claim that Plaintiff put on a respectable face for the public but made home life and their childhood years painful and difficult. They claim that Plaintiff is manipulative, self-serving, a perpetual liar, and adept at twisting stories and events to serve his own selfish

purposes. They state that his main motivation is to appear to be a good, loving father on social media and on Guam but that it is all a façade disguising his selfish and abusive tendencies.

14. In particular, the parties' adult daughter Mia Hemstad stated in her declaration, "As a victim of Tim Rohr (Tim Rohr abused me sexually, psychologically, and physically), I was always too scared to do anything that would cause him to get angry with me." Decl. of Jeffrey A. Cook, Ex. 4. Plaintiff questioned why he would be allowed to dance with her at her wedding if such things were true, and she responded, "[I]f I had told [Plaintiff] he couldn't be at my wedding, which I wanted desperately to do, all of my family and in-laws would have asked why, thus exposing decades of lies and abuse that I had grown up covering up." Id.

15. In a previous declaration, Ms. Hemstad stated the following:

> I was molested by my father when I was 8 years old. It was early in the morning. He was sitting at the breakfast table, and I was standing next to him. He stuck his hand up my shorts and pinched my butt several times. Then, I felt his finger touch my vagina. I was wearing underwear. My dad pinched my bare butt several times in my childhood. It was always in the context of affection and "tickling," but it always made me feel uncomfortable.

Opp'n to Mot. For Child Custody Pendent Lite, Ex. C, Apr. 16, 2018

16. Ms. Hemstad also stated, "There were several times my dad would walk out into the kitchen with a towel on, and then he would suddenly remove it to flash us, as if it was some kind of joke. I didn't understand why my dad thought exposing his nakedness to us girls was funny." Id.

17. Another adult daughter of the parties, Dana Marie Rohr, stated in a declaration,

> Aside from all the times he's "accidentally" come into the bathroom while his 4 daughters were getting dressed for church, the comments he's made about our growing bodies, such as "your

boobs are too big, too small, your butt is getting big" pinching our butts when we're wearing towels or underwear as he passes through to pee in front of all of us, and the times he would walk around naked or in his towel in front of his adult and teenage children, I'll just cover the most recent offense.

Id. at Ex. 6. She then went on to describe a recent time when Plaintiff allegedly told 11-year-old Gianna, one of the Minors, that she should watch out or she might get fat like her sisters. Id.

18. Another adult daughter of the parties, Michelle Rohr, stated in a declaration, "He'd pinch the breasts of myself and my sisters. I remember my mom telling him he was hurting us and told him to stop." Opp'n to Mot. for Child Custody Pendent Lite, Apr. 16, 2018, Ex. D. She stated that several times while they were growing up, Plaintiff would wear a towel around the children and expose himself to them. Id. She also recounted the following story:

> My sister doesn't remember this probably and I have not brought it up to her to see if she does remember, but many years ago when we were all in church, I noticed that my younger sister's hand was squeezing my Dad's private parts. She was too young to know this was wrong and I don't know if she was doing it because she had done it before. Instead of pushing her hand away, Dad pulled her closer in front of him (everyone was standing) and let her continue to do it. After Mass, a family friend around my age (I think we were 12 or 13 at the time) said that he saw my sister "squeezing her dad's balls." I had not said anything to make him say that. He had simply seen it too.

Id.

19. Those three daughters and other siblings also allege neglect and emotional, psychological, and physical abuse at the hands of Plaintiff. They describe years of abuse and secret problems in the household, including an unusual, confusing, and strained relationship between the parties, their parents.

20. The oldest child, Timothy Dominic Williams-Rohr claims to recall Plaintiff repeatedly kicking Defendant after she fell over during a fight with Plaintiff when Timothy was six years old. Defendant was pregnant at the time. Plaintiff countered that in fact, Defendant was attacking him, and he was trying to escape.

21. Several of the adult children explain that while growing up, they attempted to ignore or shut out the problems and that they tried to hide the truth from extended family and friends. They describe their relief now that their parents are separated.

22. Several adult children state that they have now blocked Plaintiff on social media and other communication methods and have taken pains to prevent him from learning where they live. Some have stated they never want to see or hear from him again.

23. Ms. Hemstad stated that both Defendant and Plaintiff hit the children and yelled at them while they were growing up, but Ms. Hemstad sees hope for Defendant because Defendant now recognizes her errors and is undergoing treatment to improve as a parent. Other adult siblings have stated something similar, that both parents treated them badly at times, but Defendant has tried to make amends and is seeking professional help to improve and change.

24. In contrast, the children state that Plaintiff is in denial and feigns to misunderstand why his adult children have turned against him. He has stated repeatedly that he doesn't understand why they hate him. Various of the adult children have responded that in general, now that the parents are separated and everything is in the open, they finally feel free to state their true feelings without fear.

25. The adult children have recounted various instances in which Plaintiff has used deceptive techniques and communications to gain their time and attention or to control their behavior even now that they are adults.

26. Defendant stated that she believes the best interests of the Minors would be "terribly compromised" if they stay with Plaintiff this summer. She is worried about Gianna because Gianna's therapy in the U.S. Virgin Islands would be interrupted, and also because Gianna could be subject to similar abuse that her adult sisters allege. Defendant also worries that Plaintiff will not provide William with the proper supervision and programs to accommodate his difficult behavior and autism. She is concerned that Plaintiff has no real understanding of William's significant need for various types of unique accommodations and care.

27. Several of the adult children have stated that Plaintiff cannot be trusted to provide food and care for minor children, based on their growing-up experiences and their observations of Plaintiff since they have left home. They describe Plaintiff as extraordinarily self-centered and neglectful of the basic care that minor children require.

28. In general, Defendant and the adult children allege a dismal picture of an abusive household under the manipulative hand of Plaintiff. Defendant and her adult children seem to view the fact of her leaving Plaintiff to go live in the U.S. Virgin Islands as an escape from a metaphorical prison.

29. Plaintiff denies the abuse allegations against him and claims that any touching of his daughters was unintentional or accidental. He claims to be a good, attentive father who longs for his young children, the Minors, to return home to him on Guam. He claims to not understand why his adult children have turned against him but speculates that Defendant has manipulated them to turn against him. He has filed records of various communications with William in which William begs to come to Guam and be with

him. The adult children argue that Plaintiff is simply manipulating William, who is particularly vulnerable, in the same way others among them have been manipulated.

30. Although the custody study for Defendant is ongoing, the custody study for Plaintiff on Guam has been completed. Guam's Bureau of Social Services Administration stated in the custody study's conclusion, "Based on the information gathered from Plaintiff Timothy J. Rohr, he is assessed to be suitable and capable of providing for his minor children William and Gianna." Bureau of Social Services Administration Custody Study, 11, May 1, 2019.

31. In the custody study, the social worker interviewed Plaintiff extensively, visited his home, did a criminal and child protective services background check, evaluated his home and living spaces, reported on his finances, and interviewed three character references, all provided by Plaintiff.

32. One character reference, Deacon Steve Martinez, reported that he saw Plaintiff at church regularly with his family and that Plaintiff worked to help the church grow and improve. Mr. Martinez reported that he believes Plaintiff loves and cares for his children and that Plaintiff's primary focus is to raise the children into good adults.

33. A second character reference, John Arceo, is Plaintiff's neighbor, and he reported that he and Plaintiff see each other every day. He reported that he and Plaintiff chat and talk as they work outside in the yard or talk at parties. Mr. Arceo stated that he noticed that Plaintiff bought a new car for each child because they needed it for school or work. He stated that he has never seen Plaintiff become angry and that he never saw signs of abuse with Plaintiff's children. He stated that Plaintiff's children were always happy and that the neighborhood children are respectful of Plaintiff and are all friends with Plaintiff's children.

34. A third character reference, Robert Klitzkie, a friend to Plaintiff, stated that he sees Plaintiff once per week. He has observed Plaintiff at family gatherings and has seen that Plaintiff's children love and respect Plaintiff. He stated that Plaintiff is easygoing, good around his children, a good father, and respected among his peers. He believes that Plaintiff's reputation for truth and veracity are well known and that his character and morals are beyond reproach. Mr. Klitzkie recommended that Plaintiff be awarded custody of the children.

35. No children of Plaintiff were interviewed for the custody study.

36. The matter is now before the Court.

## ISSUE

1. Whether it is in the best interest of the Minors to be in Plaintiff's physical custody during the upcoming summer break between school years.

## PRINCIPLES OF LAW

Guam law gives the Court the authority to make necessary or proper orders for the custody and care of minors in actions for divorce. 19 G.C.A. § 8404. In determining what is necessary or proper, the Court considers the best interest of the child and evidence relevant to the factors enumerated in Title 19 G.C.A. § 8404. See also Lanser v. Lanser, 2003 Guam ¶¶ 8, 16. The best interest of the child is also the standard for child custody orders *pendente lite*. See 19 G.C.A. § 8404(h) (foreseeing child custody order *pendente lite*); see also Howerton v. Howerton, 2004 Guam 8 ¶¶ 3, 37 (upholding child support order *pendente lite*); Ex parte A.J., 108 So. 3d 1040, 1045 (Ala. Civ. App. 2012) (finding that "whether to grant a pendente lite order is in the trial court's discretion," and a "trial court's pendente lite custody determination is based on the best interests of the child").

## ANALYSIS

The Court finds that it is in the best interest of the Minors to remain in the custody of Defendant for the summer. Plaintiff may visit them in the U.S. Virgin Islands according to a schedule provided later in this decision. In evaluating what is in the Minors' best interest, the Court must consider all of the factors in 19 G.C.A. § 8404. This includes the results of the custody study (see § 8404(a)(4)), which found that Plaintiff would be "suitable and capable of providing for his minor children William and Gianna." Bureau of Social Services Administration Custody Study, 11, May 1, 2019. However, it stands out to the Court that the primary person providing information to the social worker in the custody study was Plaintiff himself, who lives alone, and who can naturally be expected to present a more positive reflection of himself. The other three outside observers the social worker interviewed were people Plaintiff selected and who would also be expected to provide a more positive reflection of Plaintiff. The Court does not suggest that statements by the outside observers are untruthful or exaggerated, but their information may be incomplete due to them seeing the family mainly out of doors and in public settings. The Court acknowledges that it may be difficult to find character references with a detailed knowledge of daily life within the walls of the home, but without such knowledge, the value of the character references is diminished. Most of the parties' adult children state that over the years, Plaintiff carefully curated their family's public image to keep the underlying dysfunction well-hidden. To the extent this is true, the three outside observers would not be expected to have a complete understanding of the circumstances. In addition, it stands out to the Court that none of Plaintiff's adult children were interviewed for the custody study. The adult children would seem to be a valuable source of information for such a study. The Court is not drawing final conclusions about the alleged

abuse by Plaintiff, and none of these matters have yet gone to trial. However, weighing everything in the balance, the custody study's persuasiveness has limits.

The Court has carefully considered the declarations by seven of the parties' nine adult children that are in near perfect agreement about the painful, abusive, and neglectful environment they lived in. These adult children believe the Minors would be subjected to similar treatment at the hands of their father, Plaintiff, if the Minors were to live with him this summer. Some adult children suggest it could be made even worse because this time there wouldn't be any older children or their mother, Defendant, available to protect the Minors. Although there are some differences, each adult child's independent description of behavior and patterns about home life with Plaintiff is consistent with every other child's description. Also noteworthy is that no adult child has come to Plaintiff's defense. Again, these matters have not gone to trial, but the Court continues to find the adult children's declarations to be credible, and they weigh against Plaintiff taking custody this summer.

Considering that Defendant must update Plaintiff on all school and medical issues, it is troubling to the Court that Plaintiff claims he did not know that William had received medical care and a Risperdone prescription by a Dr. Wagner. The Court reminds Defendant of the order from Jul. 31, 2018 requiring her to update Plaintiff on all school and medical issues. The Court also reminds Defendant that she has already been held in contempt once for failing to follow Court orders. See Decision and Order, Feb. 7, 2019.

### SUMMER VISITATION SCHEDULE

The Court will permit Plaintiff to visit the Minors this summer for a period no longer than thirty (30) days. Plaintiff may choose when to begin the 30-day period, but it may begin no earlier than June 17, 2019 and end no later than eight (8) days before the beginning of the school year in the fall.

June 17 to June 30

For any days between June 17 and June 30, Plaintiff may have custody of the Minors six (6) hours every day from 12:00 p.m. to 6:00 p.m.

July 1 to Aug. 9 (except July 3 and July 4)

William's summer school program begins July 1 and ends Aug. 9. During that period, Plaintiff may have custody of the Minors each day from the time school lets out until 7:00 p.m. Plaintiff may also have custody of the Minors on weekends during that period starting each Friday at 6:00 p.m. and lasting until 6:00 p.m. each Sunday, when Defendant will resume custody. This schedule will vary on July 3 and July 4 as explained below.

July 3 and July 4

Both July 3 and July 4 are holidays in the U.S. Virgin Islands. July 3 is Emancipation Day and July 4 is Independence Day. On July 3, Plaintiff may assume custody of the Minors at 9:00 a.m. and retain custody of them until the following day, July 4 at 9:00 a.m. when Defendant will resume custody for the rest of the day.

Aug. 10 until eight (8) days before school begins

Starting Aug. 10, the parties will resume the visitation schedule from June, that is, Plaintiff may have custody of the Minors six (6) hours every day from 12:00 p.m. to 6:00 p.m. Plaintiff's final visitation day of the 30-day period must be no later than the eighth day before school begins in the fall. At 6:00 p.m. that day, or at some earlier time, Defendant will resume custody of the Minors, and Plaintiff's summer visitation will terminate.

Just as with the Christmas 2018 schedule, the visitation schedule will not change on Sundays for the purpose of allowing Plaintiff to take the Minors to mass. The Court continues to find that supervision is not necessary during Plaintiff's time spent with the Minors.

## CONCLUSION AND ORDER

For the above reasons, the Court hereby **DENIES** Plaintiff's Motion for Summertime Visitation inasmuch as it refers to the children residing on Guam but **GRANTS** Plaintiff summertime visitation of the Minors in the U.S. Virgin Islands according to the terms described above.

SO ORDERED, this ___31___ day of ___May___ 2019.

_____
HONORABLE MICHAEL J. BORDALLO
Judge, Superior Court of Guam

SERVICE VIA COURT BOX

I ack... ...dge that a copy of the original hereto was placed in the court box of:
_OOK_
_SOMERFIELD_
Date: _5/31/19_ Time _4pm_
_____
Deputy Clerk, Superior Court of Guam